312 So.2d 607

**W. C. ARMSTRONG, Jr., alias**

**v.**

**STATE.**

**6 Div. 668.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1974.

Rehearing Denied Oct. 29, 1974.

Rogers, Howard, Redden & Mills and William N. Clark, Birmingham, for appellant.

William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

DeCARLO, Judge.

Appeal from revocation of probation.

W. C. Armstrong, Jr. was tried for buying, receiving, and concealing stolen property and found guilty. Later he plead guilty to two similar charges, and on February 23, 1971, was placed on probation for seven years. In July, 1973, he was indicted for two cases of robbery and conspiracy to rob, and two cases of kidnapping. On November 15, 1973, he was arrested for these offenses, and a probation violator's warrant was placed against him. At a hearing four days later, appellant was served with a Probation Delinquency Report wherein the probation officer recommended:

"If testimony is offered inplicating Armstrong in the robbery and kidnapping of Mr. and Mrs. Lewis Faucett, it is my recommendation that his probation be revoked."

Prior to any testimony, appellant's attorney made a motion that the court grant him a two-step proceeding wherein appellant would be advised in the first proceeding of the nature of the charges, and then be given a reasonable time to meet them. He further argued he should be informed of the specific charge on which the revocation was being sought. The court answered that the main thing it was interested in was the indictments of the grand jury. Appellant's motion was overruled, and the hearing proceeded.

The State offered testimony of two probation officers; one who was originally assigned to supervise appellant, and one who introduced the violation report.

The primary testimony came from State's witness, Sandra K. Marshall, who stated that on June 2, 1972, the appellant and Besford Cain met her at the Tuscaloosa Airport. On the previous night, appellant had called her in Missouri about a robbery of Mr. and Mrs. Lewis Faucett. She testified they expected to get $30,000.-00 from a safe in Faucett's store, and appellant's share was to be 25%. On the day of the robbery, after the plans were discussed, she, along with Cain and a man named Bill, went to the Faucett home. They gained admission on the pretense that she was having car trouble. At gunpoint, Mrs. Faucett was bound and her husband was taken to the store. Because of a time-lock, the safe could not be opened, and they returned to the house. Before leaving, they took money, a coin collection, jewelry, and two pistols. One pistol and a shotgun used in the robbery belonged to appellant.

Sandra Marshall further testified that she had known appellant since 1969 and had discussed this robbery with him during the early part of 1972. After the robbery, she changed clothes at someone's home and went to the Ponderosa Cocktail Lounge operated by appellant. She and Cain remained about two hours discussing with the appellant what happened. Afterwards,

this witness and Cain left Tuscaloosa, and in September, 1972, she was arrested on a Federal flight warrant in Illinois. Following her conviction in June 1973, she testified about appellant to the July Grand Jury.

Besford Cain testified that he had known appellant since March, 1972, and had discussed the robbery with him several months earlier. On the day of the robbery, they drove over the route in appellant's Lincoln, and appellant told them where the safe was located in Faucett's store. Cain stated the revolver and shotgun used at the Faucett home were provided by appellant.

In giving details of the crime, Mr. and Mrs. Faucett testified that appellant was not one of the three robbers.

The defense then called Thomas Patrick, who testified that appellant was his friend. He further stated that he had not heard or been involved in any discussion concerning the robbery of the Faucetts. On the night of the robbery, he had seen Sandra Marshall and Besford Cain sitting alone at the Ponderosa, and not with the appellant. He further stated that Cain had commented a month before the hearing that if he (Cain) played his cards right, he hoped to get ten years probation in the case.

Appellant was the last defense witness, and his testimony contradicted that of the State. He denied having any knowledge of the Faucett matter until reading of it in the newspaper. Although he admitted knowing Sandra Marshall and Besford Cain, it was only after their arrest that he learned of their involvement. Appellant admitted driving to the airport with Cain to meet Sandra, but testified after driving to the Ponderosa, Sandra and Cain left in a pick-up truck.

After appellant's testimony, defense counsel rested the case and renewed his previous motion to exclude the evidence. The court overruled the motion and re-

voked probation. Appellant's motion to suspend the judgment and for bond pending appeal were also denied.

On June 28, 1974, our court remanded this case to the circuit court for further evidence on the issue of whether appellant had reasonable notice of the asserted probation violation before November 19, 1973. A return to the remand included this affidavit by Judge W. Aubrey Dominick:

"STATE OF ALABAMA ⎱
"TUSCALOOSA COUNTY ⎰

"A–F–F–I–D–A–V–I–T

"W. Aubrey Dominick being duly sworn, deposes and says as follows: I·am the Circuit Judge who tried the case of W. C. Armstrong, Jr., Appellant, vs. State of Alabama, Appellee, now on appeal in the Court of Criminal Appeals of Alabama, Case No. 668 Sixth Division.

"On or about November 14, 1973, Honorable Louis Lackey, District Attorney for the Sixth Judicial Circuit of Alabama, came to my office here in the Courthouse in Tuscaloosa, Alabama, and advised me that the Grand Jury of Tuscaloosa County, Alabama, had indicted W. C. Armstrong, Jr., in four separate cases, two for Robbery and two for Kidnapping, and he also advised that he had notified the Probation Officer of this Circuit of these indictments since W. C. Armstrong, Jr., was on probation for a period of seven years following a conviction of said W. C. Armstrong, Jr., by a jury on November 5, 1970, in Case No. 1019–B Circuit Court, Tuscaloosa County, Alabama, and on December 3, 1970, the said defendant was sentenced to five years imprisonment in the State Penitentiary, and on February 23, 1971, the said defendant was granted probation for a period of seven years, all before and by W. Aubrey Dominick, Circuit Judge; Mr. Lackey requested that I take some action in this matter if a probation delinquency report was made to me by the probation officer for said Mr. Armstrong, and I advised him that I would await the action of the probation officer.

"On the morning of November 15, 1973, Mr. Jerry Brazeal, State Parole and Probation Supervisor for Tuscaloosa County, and who was supervising the probation of said W. C. Armstrong, Jr., advised me that W. C. Armstrong, Jr., had been indicted by the Grand Jury of Tuscaloosa County, Alabama, in four separate cases, two for Robbery and two for Kidnapping, and he was in the process of preparing a probation delinquency report on said Mr. Armstrong on account of these indictments, and recommended that I enter a delinquency order and authorize Mr. Armstrong's arrest, and shortly thereafter the following order was entered on the Court docket by me:

'It being made to appear to the Court that the Probationer herein is delinquent as such, is reputed to have violated the criminal laws, and consorting with associates of bad repute and that a hearing should be had to determine whether probation herein should be revoked or other action taken by the Court.

'It is therefore the order and judgment of the Court and it is ordered and adjudged by the court that probationer herein is delinquent as such, and that probationer be, and hereby is, declared delinquent and that the running of probationers probationary period be and hereby is tolled and stopped and that capias and warrant forthwith issue for arrest of probationer and that when apprehended probationer be brought before the court for hearing

for the determination of the truth of the charges made against probationer herein and what action should be taken by the court and whether probation herein should be revoked and order suspending sentence herein set aside.

'Done and ordered this 15th day of November, 1973.

'/s/ Aubrey Dominick
Judge Presiding'

"During the late morning of November 15, 1973, Honorable Drew Redden, Attorney of Birmingham, Alabama, called me via telephone and stated that W. C. Armstrong, Jr., was in his office at that time and wanted Mr. Redden to represent him because he, Mr. Armstrong, understood that the Sheriff of Tuscaloosa County, Alabama, Honorable Beasor Walker, had been looking for him and had a writ of arrest for him in some case or cases, so Mr. Redden told me that he had just called the Sheriff's office in Tuscaloosa, and a clerk in the Sheriff's office had avised [sic] him that the Sheriff did have writs of arrest under four separate indictments, two being for Robbery and two for Kidnapping, and that the bond in each case had been set by me at $50,000.00, making a total of $200,000.00. Mr. Redden requested me to reduce the bonds, and I declined, but stated that I would discuss the matter with him, and as I recall, he stated that he would have to prepare a Petition for Habeas Corpus in each case unless I would reduce the bonds. It is my recollection that I then told Mr. Redden that on account of these indictments against W. C. Armstrong, Jr., I had received a delinquency report from the probation officer and had entered an Order of Delinquency against Mr. Armstrong and authorized his arrest, and a prompt hearing on the delinquency order would be set, and the outcome on that hearing could result in no action being necessary concerning the four fifty thousand dollars bonds.

"Later on November 15, 1973, I was informed by Probation Officer Brazeal that he had issued an Order of Probation and Parole Officer Authorizing Arrest of Probationer Violator, and had delivered same to the Sheriff of Tuscaloosa County, Alabama, for service on said W. C. Armstrong, Jr.

"In the afternoon of November 15, 1973, I was advised by someone from the Sheriff's office, the District Attorney's office or the Probation office that Mr. W. C. Armstrong, Jr., had come to the Tuscaloosa County Jail and voluntarily submitted himself to Sheriff Beasor Walker or one of his Deputies, and he was placed under arrest. Following that information, I entered the following Order on the Court Docket:

'It being brought to the attention of the Court that Probationer has been arrested, and has an attorney to represent him, the probation revocation hearing is hereby set for November 19, 1973, at 9:00 o'clock a. m. before the undersigned. Done and Ordered this 15th day of November, 1973.

/s/ Aubrey Dominick, Circuit Judge.'

"I then instructed Probation Officer Brazeal that I had entered an Order setting a Probation Revocation hearing for said Mr. Armstrong for Monday, November 19, 1973, at 9:00 o'clock a. m., and instructed him to advise the probationer, Mr. Armstrong, of this hearing as I understood Mr. Armstrong had been arrested and was in the County Jail. I also instructed Mr. Brazeal to advise Mr. Armstrong's attorney, Mr. Drew Redden of Birmingham of the time

of this hearing. During the late afternoon of November 15, 1973, Attorney William N. Clark, an associate of Mr. Drew Redden of Birmingham, came to the Tuscaloosa County Jail, either with or shortly after, said W. C. Armstrong, Jr., had voluntarily submitted himself to Sheriff Beasor Walker and was placed under arrest, and Probation Officer Brazeal went to the Tuscaloosa County Jail and met Mr. Clark, and notified Mr. Clark that a probation revocation hearing for Mr. Armstrong was set for Monday, November 19, 1973, at 9:00 o'clock a. m. before me. Following the meeting between Mr. Brazeal, Mr. Clark and Sheriff Beasor Walker, Mr. Clark came to my office in the later afternoon of that same date, and presented a Petition for Habeas Corpus seeking to reduce Mr. Armstrong's bond in each case, and I declined to set the Petition for Habeas Corpus for hearing and explained to Mr. Clark that following the four indictments against Mr. Armstrong, I had issued the Order of Delinquency, and that the hearing on the probation revocation was set before me for Monday, November 19, 1973, at 9:00 o'clock a. m., and I explained that if the probation was revoked on said hearing it would not be necessary to consider the Petitions for Habeas Corpus. It is my further recollection that at that time I advised Mr. Clark that I had talked with Mr. Redden via telephone, which Mr. Clark already knew, and that I had issued this Probation Delinquency Order on account of these indictments.

"When Mr. Clark left my office I instructed Probation Officer Brazeal to mail written notice to Mr. Clark confirming the oral conversation with him in which Mr. Clark was advised that the Probation Revocation hearing was set for Monday, November 19, 1973, at 9:00 o'clock a. m. Later on same date Probation Officer Brazeal advised me that the letter was being written and the Probation Delinquency Report was also being prepared.

"On the morning of Monday, November 19, 1973, probably around 9:30 o'clock a. m. Probation Officer Brazeal handed me a copy of the probation delinquency report and stated that he had also given a copy to Mr. Drew Redden. Shortly thereafter we began the probation revocation hearing and during this hearing, I advised Mr. Redden that I was going to hear other matters which were presented by the District Attorney and the Probation Officer, but the main thing that I was interested in was the indictments of the Grand Jury, and I was mainly interested in hearing the evidence concerning these indictments. (Transcript page 96) I also explained in open Court to Mr. Drew Redden why I had set the probation revocation hearing at such an early date. (Transcript page 166 and 167) I was under the impression and am still of the same opinion, that Mr. Drew Redden and Mr. William N. Clark were advised and knew on Thursday, November 15, 1973, that the Probation Delinquency Order was issued and the Probation Revocation Hearing set on account of these four indictments against said Mr. Armstrong.

"Following the probation revocation hearing, District Attorney Louis Lackey and Mr. Drew Redden agreed on reducing each bond in the four cases against W. C. Armstrong, Jr., to $10,000.00 and I approved of the reduction and the bonds were so reduced.

"I am of the opinion that when I talked with Mr. Redden over the telephone on November 15, 1973, and later in the afternoon of the same day talked with Mr. Clark, his partner, I explained to both of them that I was of the opinion that since Mr. W. C. Armstrong, Jr., was on probation after having been convicted in a criminal case and sentenced to five years in the state penitentiary by

a jury, and since probation was a discretionary matter with the Trial Judge, I, as the Trial Judge, could revoke the probation on account of these indictments in new criminal cases, after a hearing, and I am presently of that same opinion due to the fact that probation is a discretionary matter with the Trial Judge, and I tried the case in which Mr. Armstrong was convicted.

"/s/   W. Aubrey Dominick
           W. Aubrey Dominick

"STATE OF ALABAMA ⎱
"TUSCALOOSA COUNTY ⎰

"Before me, the undersigned authority in and for said County and State, personally appeared W. Aubrey Dominick, who is known to me, and who by me being first duly sworn, deposes and says that the matters contained in the above affidavit are true and correct to the best of his knowledge and belief.

"/s/   W. Aubrey Dominick
           W. Aubrey Dominick

"Sworn to and subscribed before me on this the 13th day of August, 1974.

"/s/ Elaine M. Kilgore
      Notary Public in and For Tuscaloosa
          County, Alabama"

---

### I.

The primary question is whether the procedure for revocation of probation established by the Alabama Code affords the minimal due process requirements laid down by the U. S. Supreme Court in Morrissey v. Brewer, 408 U.S. 471, 92 S. Ct. 2593, 33 L.Ed.2d 484 (1972) and made applicable to probation revocation in Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

In analyzing what process was due a parolee, the U.S. Supreme Court set out in *Morrissey*, supra, what it considered to be the two important stages in the typical process of parole revocation:

"(a) Arrest of Parolee and Preliminary Hearing. The first stage occurs when the parolee is arrested and detained, usually at the direction of his parole officer. The second occurs when parole is formally revoked. *There is typically a substantial time lag between the arrest* and the eventual determination by the parole board whether parole should be revoked. Additionally, it may be that the parolee is arrested at a place distant from the state institution, to which he may be returned before the final decision is made concerning revocation. Given these factors, due process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available. Cf. Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225 (1963). Such an inquiry should be seen as in the nature of a 'preliminary hearing' to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts which would constitute a violation of parole conditions. Cf. Goldberg v. Kelly, 397 U.S. [254], at 267–271, 90 S.Ct. [1011], at 1020–1022, 25 L.Ed.2d 287." (Emphasis added)

\* \* \* \* \* \*

"(b) *The Revocation Hearing.* There must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority. This hearing must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation. The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest the violation does not warrant revocation . . . "

In *Gagnon,* supra, the court reaffirmed its decision in *Morrissey,* supra, and added that the procedures necessary for due process in parole revocations were applicable in probation revocations. Specifically, the court held;

". . . [A] parolee is entitled to two hearings, one a preliminary hearing at the time of his arrest and detention to determine whether there is probable cause to believe that he has committed a violation of his parole and the other a somewhat more comprehensive hearing prior to the making of the final revocation decision.

"Petitioner does not contend that there is any difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation, nor do we perceive one. Probation revocation, like parole revocation, is not a stage of a criminal prosecution, but does result in a loss of liberty. Accordingly, we hold that a probationer, like a parolee, is entitled to a preliminary and a final revocation hearing, under the conditions specified in Morrissey v. Brewer, supra."

The court in *Morrissey,* supra, acknowledged it could not write a code of procedure and declared:

". . . [T]hat is the responsibility of each State. Most States have done so by legislation, others by judicial decision usually on due process grounds . . . "

Its task, the court explained, was limited to deciding what the minimum requirements of due process were in revocation cases, and set out what they included:

"(a) written notice of the claimed violations of parole;

(b) disclosure to the parolee of evidence against him;

(c) opportunity to be heard in person and to present witnesses and documentary evidence;

(d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation);

(e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and

(f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole."

\* \* \* \* \* \*

"We have no thought to create an inflexible structure for parole revocation procedures. The few basic requirements set out above, which are applicable to future revocations of parole, should not impose a great burden on any State's parole system . . . "

In *Gagnon,* supra, Justice Powell commented in a footnote that the Supreme Court did not intend "to foreclose the States from holding both the preliminary and the final hearings at the place of violation or from developing other creative solutions to the practical difficulties of the *Morrissey* requirements."

The proceedings under review were conducted pursuant to Title 42, § 24, Code of Alabama, 1940, which provides that before a probation can be revoked, there must be:

"(1) an arrest of the probationer, either on a warrant of arrest issued by the court, or a written statement by a probation officer;

"(2) a report of such arrest to the court, and

"(3) a hearing, after which the court may revoke the probation or suspension of sentence." Sparks v. State, 40 Ala.App. 551, 119 So.2d 596.

During the July, 1973, term of the Tuscaloosa County Grand Jury, appellant was indicted and later arrested on four felony charges. A probation violation warrant was placed against him and on November 19, 1973, four days after his arrest, appellant was given a hearing. He was served with a copy of the probation violation report and advised by the court that the main issue under consideration was the four felony charges.

As shown in Judge Dominick's affidavit, Mr. Armstrong had prior notice of what charges he was going to be called upon to answer. He was given an opportunity to cross-examine the State's witnesses and to present evidence. At the conclusion of his testimony, the hearing ended and the court entered the order revoking probation.

We believe that the proceedings in this case comply with those minimum requirements of due process mandated in *Morrissey* and *Gagnon*, supra.

## II.

Appellant next contends that the uncorroborated testimony of the accomplices should have been excluded. Counsel argues that without their testimony, all that remained would have been the indictments, and the existence of the indictments alone was insufficient to revoke probation.

We first note that the strict rules of evidence are not required to be observed in revocation hearings, and evidence which may not be admissible in a criminal prosecution would be admissible in parole or probation proceedings. *Morrissey* and *Gagnon*, supra.

While it is true in Alabama that a felony conviction cannot be had on the uncorroborated testimony of an accomplice, Title 15, § 307, Code of Alabama 1940, revocation of probation is not a part of the criminal prosecution, and does not embrace the rights due a person being initially prosecuted for a crime.

In Martin v. State, 46 Ala.App. 310, 241 So.2d 339, Judge Cates, quoting from State v. Duncan, 270 N.C. 241, 154 S.E.2d 53, stated:

"'. . . A proceeding to revoke probation is not a criminal prosecution, and we have no statute requiring a formal trial. Upon a hearing of this character, the court is not bound by strict rules of evidence, and the alleged violation of a valid condition of probation need not be proven beyond a reasonable doubt . . .'"

On appeal of probation revocation, the question is whether the lower court has abused its discretion, and the proof required to support a judge's discretionary order revoking probation is not the same proof required for a criminal conviction. Martin v. State, supra.

All that is required is that the evidence presented reasonably satisfy the judge. Fiorella v. State, 40 Ala.App. 587, 121 So.2d 875; Holman v. State, 43 Ala. App. 509, 193 So.2d 770; Martin v. State, supra.

A formal conviction of a crime is not essential to enable a judge to revoke his order of probation. Fiorella v. State, supra; Dixon v. State, 42 Ala.App. 341, 164 So.2d 509.

Probation is a matter of grace given to the offender by the trial judge on the basis of an independent investigation and hearing. Surely the same judge who has prescribed probation can determine whether a law has been violated and should be authorized to exercise the same discretion in determining whether a condition of the suspended sentence has been broken.

## III.

The trial court's failure to grant bond pending appeal is the basis of appellant's final argument. As is contended, this decision is discretionary with the judge under Title 42, § 24, Code of Alabama 1940, but if the evidence suffices to support revocation of probation, it also supports denial of bond pending appeal. Marlow v. State, 43 Ala.App. 494, 192 So. 2d 926.

Our required search of the record revealed no instances of error, and based on the foregoing, we affirm.

Affirmed.

CATES, P. J., and TYSON and HARRIS, JJ., concur.

ALMON, J., dissents.

ALMON, Judge (dissenting).

I must respectfully disagree with the Court's interpretation of Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L. Ed.2d 484, and Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656; particularly, with their construction of the notice required to be given a probationer prior to his probation revocation hearing.

There has been some disagreement and confusion in the past as to the precise status of one on probation. Some have held the view that since the granting of probation initially is totally within the discretion of the trial judge, then the revocation of that probation could be accomplished in the same fashion. Others were of the view that when probation was granted it became a vested conditional right to remain at large subject to divestment only for good reason after a due process hearing.

The United States Supreme Court has in my judgment put to rest most of the confusion regarding a probationer's rights with the decisions of Morrissey v. Brewer and Gagnon v. Scarpelli, supra. In *Morrissey* the Court, stated:

"We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal."

And in *Gagnon*, supra, we find:

"Even though the revocation of parole is not a part of the criminal prosecution, we held that the loss of liberty entailed is a serious deprivation requiring that the parolee be accorded due process. Specifically, we held that a parolee is entitled to two hearings, one a preliminary hearing at the time of his arrest and detention to determine whether there is probable cause to believe that he has committed a violation of his parole and the other a somewhat more comprehensive hearing prior to the making of the final revocation decision.

"Petitioner does not contend that there is any difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation, nor do we perceive one. Probation revocation, like parole revocation, is not a stage of a criminal prosecution, but does result in a loss of liberty. Accordingly, we hold that a probationer, like a

parolee, is entitled to a preliminary and a final revocation hearing, under the conditions specified in Morrissey v. Brewer, supra."

In *Morrissey* the Court set out the minimum, and I repeat—the minimum, requirements of due process which must attend parole and probation revocation hearings as follows:

"We cannot write a code of procedure; that is the responsibility of each State. Most States have done so by legislation, others by judicial decision usually on due process grounds. Our task is limited to deciding the minimum requirements of due process. They include (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. We emphasize there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial."

It is necessary to quote quite extensively from the record to see exactly what happened at the probation revocation hearing here in question:

"November 19, 1973—9:50 a. m.

"THE COURT: We're calling for trial on this hearing, on a Revocation of Probation, The State of Alabama versus W. C. Armstrong, Jr., Alias William C Armstrong, Jr., Alias Nick Armstrong: what says the State?

"MR. LACKEY: The State is ready, if the Court please.

"THE COURT: Mr. Armstrong has an attorney; Mr. Redden, from Birmingham is his attorney. What says the Defendant?

"MR. REDDEN: May it please the Court, we have this morning been served with a Probation Delinquency Report dated November 16, 1973, and signed by Mr. Brazeal—the State Parole and Probations Supervisor. We take this document to constitute pleadings in the case; it is our conception of the law governing hearings of this sort, that actually they are and should be two step procedure. First, that there should be a proceeding in which the Defendant is advised of the nature of a charge against him, and perhaps some ascertainment by the Court as to whether the Court finds there might be probable cause to believe the grounds for revocation have in fact occurred. And then, secondly, there should be a separate hearing of the matter in which the Defendant is entitled to confrontation, and to present whatever testimony he might feel at that time compelled to present.

"Now, in either event—whether that is a correct statement of the law or not, with reference to the right to a two step proceeding—we do point out to the Court that the date of this report is the 16th of November, 1973, and that we are convened in court at this time on November 19, 1973. Of course, the date of November 16 was the date on which the Defendant surrendered to the Tuscaloosa County Jail on the other charges. We would like to ascertain since the report itself refers to several items, though it appears to conclude with an accusation, as far as possible revocation is concerned, by referring to only one transaction. We would like to ascertain before going forward at all, specifically which charge or charges revocation is sought upon. And then having received that we would ask the Court for an appro-

priate time within which to prepare a defense to that charge or charges. I don't know whether the Court has had an opportunity to read the delinquency report or not.

"THE COURT: I read it just prior to the time you were handed a copy; I had not seen it until then, either.

"MR. REDDEN: Well, I think that Your Honor sees what I am speaking of: I think first it would be only appropriate that we know exactly what the nature of the charge or charges would be, and from what source the testimony would come, in order that we might prepare for it. And at this time, we do request that we be advised specifically on what grounds revocation is sought.

"MR. LACKEY: If the Court please,—

"MR. REDDEN: That is all I have at this time.

"MR. LACKEY: Excuse me, Judge, I rather took that as a request for information or position. As I understand it, Judge, the only statement that was made in here—in the report—and I only read it a couple minutes ago, was the position that the probation officer would take. And I do not take that his recommendation was in any way part of the charge or claim made against the probationer. And of course, it would be the position of the State that the charge involves the whole thing, all of the things which are indicated as being shortcomings of Mr. Armstrong as a probationer. And I think they are fairly clearly set out. . . . This Sunday closing law—with that one; with some of these other things—put them all together, all of these other things, and I think they all constitute the charge.

"THE COURT: Do you have any reply to that, Mr. Redden?

"MR. REDDEN: This Defendant was placed on probation February of 1971. According to the pleadings, the charge that a worthless draft was given, if that occurred, was received in March of 1971, about twenty-nine months ago. This was a matter that was known and determined apparently at that time, as not constituting a basis for a revocation or an attempted revocation of the probation. Now, we say that if the District Attorney, and we think that the proper position of the law actually is that the District Attorney is not a prosecutor of probation revocations; that this is a matter in which the probation officer is the representative of the State. I don't mean that the probation officer might not be entitled to counsel: I have not suggested that. But, that when the point has been reached that probation has been granted to someone, then the revocation of probation or not, ceases to be a matter for determination by the prosecuting attorney, or a matter wherein he would determine that— Well, enough is enough, as he says, dealing with cumulative matters.

"But if then, other charges are made and embraced within the basis for possible revocation on this hearing—and when I say, 'other charges,' I mean other than the allegations concerning robbery and kidnapping —then, I think that it is obvious that we are entitled to a more specific statement of when and where, since the District Attorney has stated that everything embraced in the delinquency report is going to be brought up or going to be insisted upon as a basis for revocation. There are statements with regard for example, to the business and occurrences there, where people are not identified, where time is not identified, and only in the most general fashion is conduct defined. The same thing is true with reference to placing bets on some fights, so that we say then, if this pleading —the delinquency report—and we object to it as anything other than a pleading, because it obviously is hearsay, insofar as it contains any factual statements, but if this delinquency report is to be used as a pleading, and if the basis of the charge is to be anything other than the allaged robbery case, then we are entitled to a more specific statement of it.

"THE COURT: Well, I am going to rule that the report as such is a discretion-

ary matter with the Court, about the revocation of probation. And I will take the report and give weight to those things that I feel like weight should be given to: for instance, the Sunday closing, Mr. Armstrong himself called me and wanted to know if he needed to talk to me about that, after he was arrested. I am not sure if he was arrested, or what happened—I think he was arrested. But anyway, I told him it was not necessary; that was reported to me, and that was in the probation—That would pertain to the probation officer at the time. At that time, I believe Mr. Nagel was in charge of it then, and I declined to set that down for a revocation hearing. But now, with an indictment by the Grand Jury on the robbery, and so forth, and it was reported to me that a hold had been given to the Sheriff, I did think it was important enough to set it down. So, we are going to proceed with this hearing: that is the ruling of the Court, and you have the right to except to the ruling of the Court.

"MR. REDDEN: We do respectfully except. May it please the Court, we point this out: let me first ask you so that I may be clear. Is for example, the matter of the Sunday closing law that your Honor referred to, is the matter of that incident involved in this probation revocation pleading?

"THE COURT: Well, I think it is an accumulation. But I am not—The main one I am interested in is the robbery charge, indictment by the Grand Jury in four cases, I believe, by the Grand Jury. I am interested in the Sunday closing, but not mainly interested in it.

"MR. REDDEN: When I say, 'it,' I am referring to Sunday closing violation, again. If it is a matter that would be considered at all by the Court, of course, we would want—

"THE COURT: Well, I will decide whether or not on that, and I don't have to tell you, Mr. Redden.

"MR. REDDEN: The only reason I would disagree with Your Honor in connection with that is this: in the first place, as I understand—

"THE COURT: Well, there is a law, and I know there is some argument—I am not interested in that. I am interested mainly in the indictment of the Grand Jury, and these four cases in which he was indicted in.

"MR. REDDEN: Yes, sir. Now, as to that: again, and I don't know, and I am not trying to appear stupid—whether there would be other matters, then, other than that, that the Court is considering on the hearing, I am not clear on that.

"MR. LACKEY: Judge, I am going to object to trying to get a ruling in advance.

"THE COURT: I am going to hear anything that I want to, Mr. Redden; I have told you that, and you can object at the proper time.

"MR. REDDEN: All right.

"THE COURT: But the main thing I am interested in, is the indictment of the Grand Jury.

"MR. REDDEN: Yes, sir.

"THE COURT: And that is all I am mainly interested in hearing anything, and evidence about.

"MR. REDDEN: All right, sir. We respectfully except. Now, may I return for a moment to my first proposition I was stating initially: that is, that we do take the position that it is, and is due to be a two step proceeding in which the Defendant is advised in the first proceeding of the nature of the charge against him, and then the Defendant is given a reasonable time to prepare to meet that charge. And we would ask for that time, at this time.

"THE COURT: Well, I decline to grant any further time. I think the law

had been met, and we will proceed now with the hearing.

"MR. REDDEN: Yes, sir. We respectfully except, Your Honor.

"THE COURT: All right.

"MR. LACKEY: The State calls Mr. Jerry Brazeal."

Later in the hearing the delinquency report was introduced into evidence. Included in that report were, inter alia, that "Armstrong has been charged with committing two cases of Robbery and Conspiracy to Rob and two cases of Kidnapping;" that "However, Armstrong was slow about reporting. During his period of probation Armstrong's name has continued to pop up in other criminal actions. However, no cases were brought against him. Armstrong is managing the Ponderosa Lounge in Northport. This lounge is reputed to be a place of very bad reputation and character. Several people are cut out there every week. Armstrong is taking a hap-hazard attitude toward probation and seems to have continued as he was before;" and that "On June 15, 1973 Armstrong was found guilty of Selling Beer on Sunday in Tuscaloosa County Court."

When appellant's attorney on the very morning of the hearing was presented with a copy of the delinquency report for the first time, he inquired of the trial court as to which charge or charges would form the basis of the hearing. The court responded that he did not have to tell counsel whether the Sunday closing violation would be included or not. Later, the court stated, "but the main thing I am interested in is indictment of the grand jury." The district attorney's position was that everything in the delinquency report would form the basis of the charges.

So, we have a situation where no official notice was given until the morning of the hearing and I think it is fair to say the notice given then was somewhat equivocal. Under these circumstances it is difficult to see how one could be prepared to defend oneself against charges not definitely specified. Due process demands the opportunity to be heard in defense. There is no assurance whatsoever that the appellant could have successfully defended these charges if he had had proper notice; in fact, in all probability he could not have. But his opportunity to defend should remain inviolate. Implicit in the opportunity to defend is proper notice.

I am of the opinion that the appellant was denied due process of law under the holdings of *Morrissey* and *Gagnon*, supra. See also McCain v. Sheppard, 33 Ala.App. 431, 34 So.2d 225.